## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RENE VOCKE**, | ) | |
| Plaintiff | ) | Civil Action No. 2:07cv00013 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security**, | ) | By:  PAMELA MEADE SARGENT |
| Defendant | ) | UNITED STATES MAGISTRATE JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

### I. Background and Standard of Review

Plaintiff, Rene Vocke, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Vocke's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq*. (West 2003 & Supp. 2007).  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).  This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Vocke protectively filed her applications for DIB and SSI on or about September 29, 2004, alleging disability as of May 19, 2004, due to degenerative disc disease, coccydynia, sciatica and anxiety. (Record, ("R."), at 31, 46-49, 52, 182-84.) The claims were denied initially and on reconsideration. (R. at 31-33, 37, 38-40, 187-89.) Vocke then timely requested a hearing before an administrative law judge, ("ALJ"). (R. at 41-42.) The ALJ held a hearing on January 26, 2006, at which Vocke was represented by counsel. (R. at 190-208.)

By decision dated May 8, 2006, the ALJ denied Vocke's claims. (R. at 16-21.) The ALJ found that Vocke met the insured status requirements of the Act for DIB purposes through December 31, 2009. (R. at 18.) The ALJ also found that Vocke had not engaged in substantial gainful activity at any time relevant to the decision. (R. at 18.) The ALJ further determined that Vocke suffered from a severe impairment, namely a musculoskeletal impairment. (R. at 18.) The ALJ found, however, that Vocke's impairment did not meet or medically equal the

Case 2:07-cv-00013-PMS   Document 13   Filed 02/05/08   Page 2 of 26   Pageid#: 65

requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ also found that Vocke retained the residual functional capacity to perform the exertional demands required of medium[1] work. (R. at 19.) Thus, the ALJ determined that Vocke was capable of performing her past relevant work as a customer service technician, a sewing machine operator, a production worker[2] and a general laborer. (R. at 20.) As a result, the ALJ found that Vocke was not under a disability as defined in the Act and that she was not entitled to benefits. (R. at 21.)  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2007).

After the ALJ issued his decision, Vocke pursued her administrative appeals, but the Appeals Council denied review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5, 9.) *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). Thereafter, Vocke filed this action seeking review of the ALJ's unfavorable decision. The case is before this court on Vocke's Motion For Summary Judgment filed August 17, 2007, and on the Commissioner's Motion For Summary Judgment filed September 17, 2007.

---

[1]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting of items weighing up to 25 pounds. If an individual can perform medium work, she also can perform light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2007).

[2] Vocke's job as a production worker entailed forklift operation and is also referred to as "forklift operator" in the record.  (R. at 204.)

*II. Facts*

Vocke was born in 1963, which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2007). (R. at 59.) According to the record, Vocke graduated from high school and attended two years of college. (R. at 57.) Vocke has past relevant work experience as a customer service technician, a production worker, a sewing machine operator and a general laborer. (R. at 53, 204.)

At a hearing before the ALJ on January 26, 2006, Vocke testified that she last worked as a customer service technician, but was unable to continue work in customer service, because she could not sit for long periods due to excruciating lower back pain. (R. at 195.) Vocke stated that her pain was constant and radiated into her right leg, causing her to have trouble lifting her leg up. (R. at 195.) She noted that lying down was the only way to relieve her pain. (R. at 195.) Vocke testified that she received pain treatment from Dr. Moore, and that the medication he prescribed her helped "somewhat," but that the medication was "not strong enough [and] it didn't work like [she felt] that it should." (R. at 196.)

While at the hearing, Vocke remarked that her back was hurting from sitting in the chair, which caused her to stand and stretch for relief. (R. at 196.) She noted that she could sit for only 10 to 15 minutes, could stand for less than five minutes and could not walk far. (R. at 196-97.) Vocke testified that if she tried to wash dishes, sweep, mop or clean laundry, that she would be "down for two weeks." (R. at 197-98.) Vocke also testified that she was having problems with absences when she was working, and that she probably missed work two weeks a month. (R. at

-4-

198.) Vocke stated that every day was a bad day for her. (R. at 198.) She continued to state, however, that though she might have one good day a month, she tried not to overdo herself on that day, because doing such could cause her to "be down for two weeks." (R. at 198-99.) Vocke testified that Dr. Moore had recommended surgery and additional tests, but that she could not afford any further treatment due to lack of insurance. (R. at 199, 201.) Vocke testified that she was unable to go to the grocery store, bend or lift. (R. at 199-200.) Vocke also stated that she could not lift a gallon of milk or tie her shoes without pain. (R. at 200.) Vocke testified she could not work a job where she rotated between sitting and standing, because she had to lie down about five out of every six hours. (R. at 201.) Vocke noted that she got some relief by lying on heating pads or soaking in a bathtub. (R. at 202.) With regard to her alleged mental impairments, Vocke testified that she had "bad nerves," she was "real irritable" and it was difficult for her "to be around other people." (R. at 200.) Vocke explained that she was easily stressed, and she suffered from depression. (R. at 200-01.)

Cathy Sanders, a vocational expert, also testified at Vocke's hearing. (R. at 202-07.) Sanders described Vocke's past relevant work as a customer service technician as sedentary[3] and semiskilled; her work as a sewing machine operator as light[4] and semiskilled; her work as a production worker as medium and semiskilled; and her work as a general laborer as medium and light and

---

[3]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* C.F.R. §§ 404.1567(a), 416.967(a) (2007).

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she can also perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

semiskilled. (R. at 204.) Sanders noted that Vocke's job as a customer service technician supplied her with "cursory computer knowledge," and that certain computer skills Vocke learned as a customer service technician would be transferable. (R. at 204.)

Sanders was asked to consider a hypothetical individual of Vocke's age, education and work experience who could perform work consistent with the exertional limitations set forth in Exhibit 6F.[5] (R. at 204-05.) Sanders testified that the hypothetical individual could perform medium and light work as a cashier, a nonconstruction laborer, a cleaner, a miscellaneous food preparer, a stocker, an assembler, a sorter and a packer. (R. at 205.) Sanders also stated that the hypothetical individual could perform light work as a general office clerk, a nonpostal mail sorter, an interviewer, a ticket clerk, an information clerk, a parking lot attendant, a greeter or host and an administrative assistant. (R. at 205.) Sanders testified that there would be a significant number of jobs in the national and regional economies for such an individual. (R. at 205.)

The ALJ further asked Sanders to assume a second hypothetical individual who possessed the limitations set forth in Exhibit 6F and who also possessed the additional nonexertional limitations set forth in Exhibit 7F.[6] (R. at 205-06.) The

---

[5]Exhibit 6F is a Physical Residual Functional Capacity Assessment completed by state agency physicians. (R. at 154-59.) The assessment concluded that Vocke had the residual functional capacity to perform work at the medium exertional level. (R. at 155.)

[6]Exhibit 7F is a Psychiatric Review Technique form, ("PRTF"), completed by state agency psychologists. (R. at 160-72.) This form listed mild functional restrictions in activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 170.)

ALJ asked Sanders if the additional restrictions would have any impact on any of the jobs which Sanders identified were available for the first hypothetical individual. (R. at 206.) Sanders stated that the second hypothetical individual would have mild limitations in three areas, resulting in a 10 percent reduction in the employment base. (R. at 206.) Sanders testified, however, that there still would be a significant number of jobs in the national and regional economies for such an individual. (R. at 206.)

The ALJ completed his questioning by asking Sanders to consider a third hypothetical individual. (R. at 206.) The ALJ noted that the third hypothetical individual possessed the same limitations as the first two hypothetical individuals and, in addition, possessed the limitations that Vocke testified to at the hearing. (R. at 206.) Sanders replied that such an individual would be unable to work in competitive employment because of the need to lie down frequently. (R. at 206-07.)

In rendering his decision, the ALJ reviewed records from Dr. R. Michael Moore, M.D.; St. Mary's Hospital; Wise County Health Department; Coeburn Hospital Clinic; Dr. Kevin Blackwell, D.O.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; Louis A. Perrott, Ph.D., a state agency psychologist; and E. Hugh Tenison, Ph.D., a state agency psychologist.

The record shows that Vocke sought treatment from Dr. R. Michael Moore, M.D., from July 30, 2002, to November 11, 2005.[7] (R. at 102-30, 173-75.) Vocke presented to Dr. Moore on July 30, 2002, complaining of numbness in both big toes. (R. at 129.) Dr. Moore diagnosed Vocke with chronic back pain, degenerative disc disease, gastroesophageal reflux disease, ("GERD"), and anxiety disorder. (R. at 129.) For these conditions, Dr. Moore prescribed Soma, Klonopin, Ultram and Aciphex. (R. at 129.)

Vocke returned on October 10, 2002, complaining of a knot in the center of her back. (R. at 127.) Dr. Moore's examination revealed that Vocke's lower back was nontender, and he diagnosed her with chronic back pain. (R. at 127.) Dr. Moore provided Vocke a letter for her work, notifying her employer of her current medications and stating that Vocke was under no restrictions at that time. (R. at 127.) Vocke returned to Dr. Moore's office on October 20, 2002, complaining of chronic back pain, anxiety and GERD. (R. at 126.) Dr. Moore's examination revealed tenderness in Vocke's lower back. (R. at 126.) She was given prescriptions for Soma, Klonopin, Ultram and Aciphex and was diagnosed with chronic back pain, anxiety disorder and GERD. (R. at 126.)

Vocke presented to Dr. Moore on January 16, 2003, complaining again of chronic back pain and anxiety. (R. at 125.) Dr. Moore noted that Vocke had a history of back pain and that her right shoulder had previously "flared up." (R. at 125.) Dr. Moore's examination revealed a tender acromioclavicular, ("AC"), joint

---

[7]As noted in the ALJ's opinion, Dr. Moore's medical records consist of "fragmented, general, incomplete and non-descriptive notes." (R. at 19.)

and decreased range of motion, ("ROM"), in Vocke's glenohumeral joint, ("GHJ"). (R. at 125.) She was again diagnosed with chronic back pain, anxiety disorder and GERD and was given prescriptions for Soma, Klonopin and Darvocet, along with an intramuscular injection of Depo-Medrol in her right shoulder. (R. at 125.)

A visit to Dr. Moore's office on April 10, 2003, revealed that the Depo-Medrol injection did not "help" Vocke's right shoulder. (R. at 124.) On that same date, Vocke's lower back was described as stiff and tender, and it was noted that sitting at work made Vocke's "back worse – down to tailbone." (R. at 124.) An examination of Vocke's right shoulder revealed no tenderness unless Vocke "move[d] it up." (R. at 124.) Vocke was diagnosed with chronic back pain, anxiety disorder, GERD and a right shoulder strain and was prescribed medications for those conditions. (R. at 124.) It is noted in Dr. Moore's treatment notes that Vocke was "off of work" from April 5, 2003, to April 10, 2003.[8] (R. at 124.) The record also contains a work excuse note indicating that Vocke was under Dr. Moore's care from April 17, 2003, to May 5, 2003, and was to remain off work through May 4, 2003, because of back strain. (R. at 119.)

On June 3, 2003, Vocke presented to Dr. Moore, complaining that a recent fall caused her to injure her tailbone and right shoulder. (R. at 123.) Vocke explained that she slipped in the yard and landed on her tailbone, and that she reached back while falling and reinjured her shoulder. (R. at 123.) Dr. Moore's

---

[8]Dr. Moore's records provide the abbreviation "OOW," which is used to indicate that Vocke was "off of work" on several occasions. Some instances in the record provide that an excuse note was provided for Vocke, and some of these notes are produced in the record. Other instances in the record do not indicate that a note was provided to Vocke and only indicate that she was "off of work."

Case 2:07-cv-00013-PMS   Document 13   Filed 02/05/08   Page 9 of 26   Pageid#: 72

examination revealed tenderness at the tip of Vocke's coccyx, and she was diagnosed with right shoulder strain and coccydynia. (R. at 123.) Dr. Moore prescribed pain medication and ordered x-rays. (R. at 123.) An x-ray taken on June 3, 2003, of Vocke's sacrum and coccyx revealed no acute lesions of the bones and unremarkable soft tissues. (R. at 130.) An x-ray of the right shoulder on the same date revealed mild arthritic changes of the AC joint, with no acute bony lesions and unremarkable soft tissues. (R. at 130.) Vocke returned to Dr. Moore's office on June 17, 2003, for pain in her tailbone and shoulder, and she was prescribed Lortab and was diagnosed with a right shoulder strain and a contusion to her coccyx. (R. at 121.) Dr. Moore's records indicate that "absent forms" were completed for Vocke to be "off of work" from May 28, 2003, to July 16, 2003. (R. at 121, 123.)

Vocke returned to Dr. Moore's office on July 18, 2003, and indicated that she had a "catch in back" and "pain in tailbone." (R. at 120.) Dr. Moore noted that Vocke had a tender lower back and coccyx, and he diagnosed Vocke with chronic back pain, degenerative disc disease, anxiety disorder and GERD. (R. at 120.) Vocke was prescribed Klonopin, Soma, Lortab, Aciphex and Bextra. (R. at 120.) Vocke also was seen on October 17, 2003, for chronic back pain, anxiety disorder, degenerative disc disease and GERD. (R. at 118.)

On November 3, 2003, Vocke requested a leave of absence from her work, indicating that a serious health condition made her unable to perform at least one of the essential functions of her job. (R. at 117.) Vocke requested a leave of absence from October 23, 2003, to December 20, 2003, and provided her employer with a

-10-

Health Care Provider Certification of Medical Condition form, ("FMLA[9] form"), signed by Dr. Moore, indicating that she had a serious health condition under the FMLA. (R. at 116.) Vocke's FMLA form stated that she had chronic back pain with exacerbation and degenerative disc disease, and that she was presently incapacitated "2 months yearly." (R. at 116.) The form also provided that Vocke was unable to perform work of any kind and was unable to perform any duties of her work during this period. (R. at 116.)

Another FMLA form, which was undated, but signed by Dr. Moore and Vocke, provided that commencing January 16, 2003, Vocke would be periodically incapacitated up to two weeks each month for the duration of her lifetime.[10] (R. at 115.) The undated form indicated that Vocke suffered from chronic back strain, coccydynia and degenerative disc disease. (R. at 115.) The form also provided that Vocke was unable to perform work of any kind and was unable to stand or sit. (R. at 115.) An undated Employee's Request for Leave of Absence form filled out by Vocke, for her employer, also noted that Vocke would need time off as needed due to a serious health condition. (R. at 114.)

Vocke returned to Dr. Moore's office on January 16, 2004, for chronic back pain, anxiety disorder, GERD and degenerative disc disease. (R. at 112.) Vocke informed Dr. Moore that she had "lots of stress," was having symptoms of fatigue and malaise and that her back was hurting. (R. at 112.) Dr. Moore's examination

---

9FMLA is the common abbreviation for the Family Medical Leave Act of 1993.

10Another FMLA form, dated March 2, 2004, is found in the record and contains the same information provided on the undated form. (R. at 110.)

Case 2:07-cv-00013-PMS   Document 13   Filed 02/05/08   Page 11 of 26   Pageid#: 74

revealed tenderness and stiffness in Vocke's lower back. (R. at 112.) Vocke was given an excuse note for work stating that she was under Dr. Moore's care from January 6, 2004, to January 19, 2004, for anxiety disorder and back strain. (R. at 111.)

On April 16, 2004, Vocke presented to Dr. Moore with complaints of chronic back strain, anxiety disorder and GERD. (R. at 109.) The record indicates that Vocke mopped a floor on April 11, 2004, and went to work on April 12, 2004, which caused her to be confined to bed until her April 16, 2004, visit. (R. at 109.) Vocke was given refills on her medications, was instructed not to drive while taking Klonopin, Soma or Lortab and was instructed to remain off work until April 26, 2004. (R. at 109.) Vocke again presented to Dr. Moore on June 8, 2004, after an automobile accident on May 26, 2004. (R. at 108.) Vocke reported that she had not worked since May 19, 2004, but that she felt she could return on June 15, 2004. (R. at 108.) Vocke also stated that her Lortab was "not helping," and she was referred to a pain management center by Dr. Moore. (R. at 108.) On July 26, 2004, Vocke indicated that she cancelled her appointment at the pain management center because she could not afford it, and that she was going to file for disability. (R. at 107.) On that same date, Vocke noted that she was able to return to work since her last visit, but that her back was "killing her." (R. at 107.) On July 26, 2004, and November 18, 2004, Dr. Moore's diagnoses regarding her back pain and medications were similar to previous visits. (R. at 105, 107.) On August 3, 2004, Vocke was seen at the Wise County Health Department and was diagnosed with degenerative disc disease, anxiety and GERD. (R. at 134.)

-12-

Vocke presented to Dr. Moore on February 18, 2005, with complaints of anxiety disorder and chronic back pain. (R. at 103.) Dr. Moore noted that Vocke had lost 9 ½ pounds, that her elbows and knees were sore and that her lower back was stiff and sore. (R. at 103.) In addition to chronic back pain, anxiety disorder and GERD, Vocke was diagnosed with osteoarthritis in her knee and elbows. (R. at 103.) Vocke was prescribed Klonopin, Soma, Lortab, Phenergan and Voltaren for these conditions. (R. at 103.)

Vocke also presented to Dr. Moore on May 11, August 11 and November 11, 2005, with chief complaints of chronic lower back pain, GERD and anxiety disorder. (R. at 173-75.) These treatment notes indicate that Vocke was having trouble sleeping, felt drained, and was having pain in her lower back, right knee and left elbow. (R. at 173.) Dr. Moore diagnosed chronic back strain, anxiety disorder, GERD, osteoarthritis in the knee and elbows and herniated nucleus pulposus. (R. at 173-75.)

Vocke complained of back and knee pain on September 20, 2004, at the Coeburn Hospital Clinic. (R. at 143-46.) While treatment notes are mostly illegible on this date, it appears that an old MRI revealed degenerative disc disease at L5-S1 level of the spine, with no nerve impingement. (R. at 143-46.) The notes also indicate that Vocke complained of "bad nerves." (R. at 144.) Vocke returned to the Coeburn Hospital Clinic on October 19, 2004, complaining of lower back pain. (R. at 142.) Treatment notes indicate that Vocke's pain was constant and radiated into her left leg. (R. at 142.) The notes also indicate that Vocke was very apprehensive. (R. at 142.) Vocke was diagnosed with chronic low back pain, among other conditions illegibly written on the hospital's evaluation form. (R. at

-13-

142.) On November 22, 2004, Vocke again presented to the Coeburn Hospital Clinic, complaining of lower back pain. (R. at 141.) Vocke informed the clinic that she could not afford an MRI, could not sit long at work, that she cried all the time and that she was unable to do anything. (R. at 141.) Vocke also sought treatment for her lower back pain on January 3, 2005, and March 30, 2005.[11] (R. at 138, 140.) Her treatment notes are mostly illegible on these dates, but do indicate that her back pain was aggravated by exertion, and that she had marked tenderness in her lower back. (R. at 138, 140.)

Dr. Kevin Blackwell, D.O., examined Vocke at the request of the Virginia Department of Rehabilitative Services and completed a Medical Consultant Report on January 7, 2005. (R. at 147-53.) Dr. Blackwell noted that Vocke had an MRI a "couple of years back," and she was told she had degenerative disc disease. (R. at 147.) Dr. Blackwell's musculoskeletal examination revealed that Vocke's fine motor movement skills were normal, her grip strength was good and her reflexes were 2/4 in the upper and lower extremities. (R. at 149.) Dr. Blackwell also noted a negative straight leg raise test at 60 degrees. (R. at 149.) Dr. Blackwell concluded that Vocke was capable of sitting or standing for eight hours in a typical eight-hour work day and that she could occasionally lift items weighing up to 50 pounds and frequently lift items weighing up to 25 pounds. (R. at 149.) Dr. Blackwell also concluded that Vocke had no limitations on her fine motor movement skills, but that she should limit her squatting, kneeling and stooping to no greater than one-third of any given day. (R. at 149-50.) An x-ray of Vocke's lumbar spine, ordered

---

11Another visit to the Coeburn Hospital Clinic on March 3, 2005, appears to be only for cough and congestion. Again, the notes are mostly illegible. (R. at 139.)

by Dr. Blackwell and taken on the same date as his examination, revealed "minimal degenerative change without other acute abnormality." (R. at 153.)

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on January 20, 2005. (R. at 154-59.) Dr. Surrusco found that Vocke could occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, that she could stand and/or walk and/or sit for a total of about six hours in a typical eight-hour workday and that Vocke had an unlimited ability to push and/or pull in her upper and lower extremities. (R. at 155.) Dr. Surrusco also concluded that Vocke had no postural, manipulative, visual, communicative or environmental limitations. (R. at 156-57.) Dr. Surrusco determined that the medical evidence established medically determinable impairments of chronic right knee and lower back pain and GERD. (R. at 159.) Dr. Surrusco noted that Vocke's statements regarding function, medical history, the character of her symptoms, her activities of daily living, the type of treatment she received, her response to treatment and her work history were found to be partially credible. (R. at 159.) He also noted that there were no objective findings to substantiate Vocke's allegations regarding the severity of her limitations. (R. at 159.) Dr. Randall Hays, M.D., another state agency physician, affirmed Dr. Surrusco's findings on May 20, 2005. (R. at 158.)

Louis A. Perrott, Ph.D., a state agency psychologist, completed a PRTF on January 18, 2005. (R. at 160-72.) Perrott's assessment revealed that Vocke suffered from a nonsevere anxiety-related disorder. (R. at 160, 165.) Perrott concluded that Vocke experienced mild restrictions on her activities of daily living, experienced

-15-

mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace. (R. at 170.) He also concluded that Vocke had experienced no repeated episodes of decompensation. (R. at 170.) Perrott reported that Vocke's statements regarding her limitations were partially credible. (R. at 172.) E. Hugh Tension, Ph.D., another state agency psychologist, reviewed Perrott's report and affirmed his findings on May 20, 2005. (R. at 160.)

Dr. Moore completed a medical assessment of ability to do work-related physical activities on February 10, 2006. (R. at 178-79.) Dr. Moore reported that Vocke could lift items weighing up to two pounds frequently and items weighing up to five pounds occasionally. (R. at 178.) He also determined that Vocke could stand, walk and/or sit for a total of three hours a day in a typical eight-hour workday, but that she could stand, sit or walk for only one-half hour at a time without interruption. (R. at 178.) Dr. Moore further reported that Vocke could not climb, stoop, kneel, balance, crouch or crawl and that she had a decreased ability to reach and to push and/or pull. (R. at 179.) He also noted that she was restricted from working around heights or moving machinery, in temperature extremes, in humid conditions or around vibration. (R. at 179.)

Dr. Moore also completed a mental assessment of ability to do work-related activities on February 10, 2006. (R. at 180-81.) Dr. Moore indicated that Vocke had a seriously limited, but not precluded, ability to follow work rules, to relate to co-workers, to function independently, to maintain attention and concentration, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 180-81.) Dr. Moore also

indicated that Vocke had no useful ability to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses and to understand, remember and carry out complex and detailed job instructions. (R. at 180-81.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir.

-17-

1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 8, 2006, the ALJ denied Vocke's claims. (R. at 16-21.) The ALJ found that Vocke met the insured status requirements of the Act for DIB purposes through December 31, 2009. (R. at 18.) The ALJ also found that Vocke had not engaged in substantial gainful activity at any time relevant to the decision. (R. at 18.) The ALJ further determined that Vocke suffered from a severe impairment, namely a musculoskeletal impairment. (R. at 18.) The ALJ found, however, that Vocke's impairment did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ also found that Vocke retained the residual functional capacity to perform the exertional demands required of medium work. (R. at 19.) Thus, the ALJ determined that Vocke was capable of performing her past relevant work as a customer service technician, a sewing machine operator, a production worker and a general laborer. (R. at 20.) As a result, the ALJ found that Vocke was not under a disability as defined in the Act, and that she was not entitled to benefits. (R. at 21.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2007).

Vocke argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 5-7.) Vocke also argues that the ALJ erred by failing to find that she suffered from severe nonexertional impairments. (Plaintiff's Brief at 8-9.)

-18-

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Vocke's first argument is that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Brief at 5-7.) An individual's residual functional capacity is defined as the most an individual can do despite the limitations caused by her physical and/or mental impairments. *See* 20 C.F.R. §§

404.1545(a), 416.945(a) (2007); *see also Smith v. Heckler*, 782 F.2d 1176, 1180 (4th Cir. 1986). With respect to Vocke's physical impairments, there is substantial evidence to support the ALJ's finding that Vocke can perform the full range of medium exertional activity. (R. at 19.) The regulations specify that the responsibility for making the determination of whether a claimant is disabled is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (2007). In doing so, the Commissioner must review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (2007). The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof in disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). However, an ALJ may reject the opinions of a treating physician if the opinions are not supported by medically acceptable clinical and laboratory diagnostic techniques or if the opinions are not consistent with the other substantial evidence. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007).

While Dr. Moore diagnosed Vocke with chronic back strain, osteoarthritis of the knees and elbows and herniated nucleus pulposus, there is no objective evidence to support the severity of Vocke's alleged symptoms. As the ALJ indicated, "[x]-rays of the claimant's right shoulder, sacrum and coccyx have all been negative. Lumbar spine x-rays, as recently as January 7, 2005, showed only minimal degenerative changes without an acute abnormality." (R. at 19.) Further,

Dr. Blackwell's musculoskeletal examination revealed that Vocke's fine motor movement skills were normal, her grip strength was good and her reflexes were 2/4 in the upper and lower extremities. (R. at 149.) Dr. Blackwell also noted a negative straight leg raise test at 60 degrees. (R. at 149.) Dr. Blackwell concluded that Vocke was capable of medium work. (R. at 149.) Despite Vocke's allegation that she has to lie in bed all day, an x-ray of Vocke's lumbar spine, ordered by Dr. Blackwell, revealed "minimal degenerative change without other acute abnormality." (R. at 153.) In addition, the physical assessment completed by Dr. Surrusco and Dr. Hays indicated that Vocke could perform medium work. (R. at 154-59.) They further concluded that there were no objective findings to substantiate Vocke's allegations regarding the severity of her limitations and that her statements regarding those limitations were only partially credible. (R. at 159.) "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." *Hays,* 907 F.2d at 1456. In this case, the lack of objective evidence and the findings of both Dr. Blackwell and the state agency physicians justify the ALJ in assigning little weight to Dr. Moore's diagnoses and medical opinions. Thus, with respect to her physical impairments, I find that there is substantial evidence to support the ALJ's finding that Vocke can perform the full range of medium exertional activity.

Vocke's second argument is that the ALJ erred by failing to find that she suffered from severe nonexertional impairments. (Plaintiff's Brief at 8-9.) Based on my review of the evidence, I find that substantial evidence does not exist to support the ALJ's finding that Vocke did not suffer from a "severe" mental impairment, and that the ALJ failed to fully the develop the record with regard to

-21-

Vocke's mental limitations. With regard to her alleged mental impairments, Vocke testified that she had "bad nerves," she was "real irritable" and it was difficult for her "to be around other people." (R. at 200.) Vocke explained that she was easily stressed, and she stated that she suffered from depression. (R. at 200-01.) In addition, Vocke repeatedly complained of anxiety to Dr. Moore, noting at times that she had "lots of stress" and was having trouble sleeping. (R. at 112, 175.) On at least one occasion, Dr. Moore excused Vocke from work, in part due to anxiety disorder. (R. at 111.) Dr. Moore also completed a mental assessment indicating that Vocke had a seriously limited, but not precluded, ability to follow work rules, to relate to co-workers, to function independently, to maintain attention and concentration, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 180.) Dr. Moore also indicated that Vocke had no useful ability to deal with the public, to judgment, to interact with supervisors, to deal with work stresses and to understand, remember and carry out complex and detailed job instructions. (R. at 180-81.) Treatment notes from the Coeburn Hospital Clinic reveal that Vocke complained of "bad nerves," that she was apprehensive and that she cried all the time. (R. at 141-42, 144.) In addition, Vocke was diagnosed with anxiety at the Wise County Health Department in August 2004. (R. at 134.)

While Perrott and Tenison's PRTF reveal that Vocke suffered from a nonsevere anxiety-related disorder, and that Vocke had only a few mild restrictions, this assessment was made by nonexamining psychologists. (R. at 160, 165, 170.) Neither of these psychologists personally examined the plaintiff, but instead, performed only the discrete task of assessing plaintiff's purported mental

-22-

residual functional capacity based on the medical record. The opinion of a nonexamining healthcare professional cannot, by itself, serve as substantial evidence supporting a denial of disability when it is contradicted by all of the other evidence in the record. *See Leonard v. Schweiker*, 724 F.2d 1076, 1078 (4th Cir. 1983) (citing *Martin v. Sec'y of Dep't of Health, Educ. & Welfare*, 492 F.2d 905 (4th Cir. 1974)).

Further, the Social Security Regulations require that before a determination is made that a claimant is not disabled, the Social Security Administration is "responsible for developing [a] complete medical history, including arranging for . . . consultative examination(s) if necessary . . . ." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (2007). Indeed, it is well-settled that the ALJ has a duty to help develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). In *Cook*, the court stated that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." 783 F.2d at 1173. The regulations require that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1513(e), 416.913(e) (2007). In this case, the evidence regarding Vocke's mental limitations is sufficient to show that she *may* suffer from a severe impairment, but it is not sufficient to indicate that she does not suffer from a severe mental impairment.[12]

---

[12]It should be noted that Vocke mentions that her "family doctor" is now Dr. Gurcharan Kanwal in her disability report. (R. at 55.) She also reports that he prescribed her Valium for anxiety. (R. at 56, 79, 93.) However, his medical records are lacking in the administrative record.

The regulations provide that if a claimant's "medical sources cannot or will not give [the Social Security Administration] sufficient medical evidence about [claimant's] impairment . . . to determine whether [claimant is] disabled . . . [claimant] may [be asked] to have one or more physical or mental examinations or tests," which will be paid for by the Social Security Administration. 20 C.F.R. §§ 404.1517, 416.917 (2007). According to 20 C.F.R. §§ 404.1519a, 416.919a, the decision to order a consultative examination will be made after giving full consideration to whether additional information is needed, such as clinical findings, laboratory tests, diagnoses and prognoses, and whether it is "readily available from the records of [claimant's] medical sources." Sections 404.1519a, 416.919a further provide that the Social Security Administration will "use a consultative examination to secure needed medical evidence the file does not contain such as clinical findings, laboratory tests, a diagnosis or prognosis necessary for decision."

Here, I find that the medical records submitted by Vocke raise a question regarding her mental limitations that requires the need for further investigative studies. The United States Court of Appeals for the Fourth Circuit has noted that DIB and SSI benefits exist to give financial assistance to disabled persons because they are unable to sustain themselves. *See Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984). Thus, the court has held that "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because [s]he is too poor to obtain medical treatment that may help [her]." *Gordon*, 725 F.2d at 237. Vocke indicated multiple times in the record that she could not afford additional treatment because of lack of insurance and insufficient financial resources. (R. at 107, 141, 143, 199.)

-24-

Further, the ALJ failed to meaningfully discuss plaintiff's mental allegations and the mental diagnoses noted in the treatment notes from the Coeburn Hospital Clinic and the Wise County Health Department. "Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). It also is clear that "[i]n the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim*, 495 F.2d at 397).

For all these reasons, I find that substantial evidence does not support the ALJ's finding that Vocke does not suffer from a severe mental impairment. I also find that the requirements for ordering a consultative examination under the applicable regulations were met, and that the ALJ erred by not securing a consultative examination to further assess Vocke's mental impairments. On remand, the ALJ should further develop the record to determine the extent of Vocke's mental impairments and their impact on her residual functional capacity.

*IV. Conclusion*

For the foregoing reasons, I will deny the Commissioner's motion for summary judgment and Vocke's motion for summary judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further consideration of Vocke's mental residual functional capacity and ability to work.

I further deny Vocke's request to present oral argument based on my finding that it is not necessary in that the parties have more than adequately addressed the relevant issues in their written arguments.

An appropriate order will be entered.

**ENTER:** This 5th day of February 2008.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-26-